UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cr-56-TRM-SKL |
| | ) | |
| DEMETRIUS BOWMAN, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress filed by Defendant Demetrius Bowman. ("Defendant") [Doc. 72]. Defendant's motion seeks to suppress all evidence obtained as a result of a traffic stop and ensuing vehicle search, including Defendant's subsequent incriminating statements. Plaintiff United States of America ("Government") filed a response in opposition to the motion [Doc. 79]. The motion to suppress was referred for a report and recommendation by standing order pursuant to 28 U.S.C. § 636(b). An evidentiary hearing on the motion was held on January 25, 2022. Post-hearing briefs were submitted and considered [Doc. 97 & 100], and this matter is now ripe.

For the reason addressed below, I **FIND** no constitutional violation occurred with respect to all claims raised in Defendant's motion to suppress and I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

## I.     FACTUAL BACKGROUND

The Government called the following witnesses: Drug Enforcement Administration ("DEA") Task Force Officer Justin Headden, DEA/Bartow-Cartersville Drug Task Force Agent Edward Leon ("Leon"), Georgia Department of Public Safety ("GDPS") Sergeant Kendall Stanley

("Stanley") and GDPS Sergeant Jay Thompson ("Thompson" and collectively with Stanley, "Troopers").[1] Defendant called no witnesses. The collective evidence credibly establishes at least the following.

In the summer of 2020, the Chattanooga, Tennessee Resident Office of the DEA investigated a suspected heroin and methamphetamine drug trafficking organization located in the Eastern District of Tennessee. DEA identified Dekarlos Fort ("Fort"), one of Defendant's co-defendants, as the leader of that organization. Eventually, DEA identified Defendant as a co-conspirator of Fort's.

During the investigation, DEA applied for, and obtained, a series of state court orders authorizing the interception of communications ("wiretaps") involving several telephones utilized by Fort. DEA considered Fort, the target of its investigation, to be "loosed lipped" in his wire communications. For example, as a result of the wiretaps and other investigative work, law enforcement was able to make several traffic stops of customers after they made purchases of illegal drugs from Fort/the drug trafficking organization.

Defendant was intercepted speaking with Fort a "few times" in conversations DEA believed to be about illegal methamphetamine drug trafficking. On June 26, 2020, one of the first times Defendant was heard on the wiretaps, Defendant and Fort were intercepted discussing prices for buying and selling "Clear," which the DEA concluded was methamphetamine. On July 2 and July 3, 2020, DEA again intercepted communications between Defendant and Fort. DEA

---

[1] It is assumed that Defendant's post-hearing brief's reference to "Trooper Taylor" is a reference to Thompson. The witnesses have varying degrees of extensive law enforcement training and experience. As their law enforcement credentials, training, experience, and odor detection abilities were not directly challenged by Defendant, they will not be detailed herein. Suffice it to say, the witnesses' testimony, including testimony about their proven ability to detect the odor of marijuana, was not successfully challenged or undermined by Defendant.

concluded Defendant and Fort were discussing illegal drug trade pricing and going to Atlanta, Georgia to "reup" their illegal narcotics supply.   In the intercepted communications on July 2, Defendant and Fort arranged to meet in Chattanooga on July 3 and then travel to Atlanta, a city known by DEA to be a source of supply for illegal drug distribution.

On July 3, DEA conducted physical surveillance on Defendant and Fort as they met in and travelled from Chattanooga to, and around, Atlanta in a white Jeep rented by Defendant ("Jeep"). DEA continued its surveillance in Georgia as Defendant and Fort visited two shopping malls and a residence in the Atlanta area.   During this time, DEA intercepted several calls in which Fort spoke to a source of supply in attempts to arrange a drug transaction.   DEA concluded that Fort and Defendant were successfully "reupping" their supply of illegal drugs from Defendant's source, but that Fort's source fell through.   Defendant and Fort remained at the residence for about an hour and then headed back toward Chattanooga.

After Defendant and Fort left the residence that evening, they traveled to Interstate 75 Northbound.   DEA had earlier coordinated with GDPS and the Bartow-Cartersville Drug Task Force for assistance with surveillance and a potential traffic stop.   Stanley, an experience interdiction officer, traveled about 40 miles to the area where he was waiting to make an interdiction stop of the Jeep near the Bartow County area.   Stanley has made many such interdiction stops over his law enforcement career and he understood that DEA wanted him to develop probable cause for a traffic stop.   Stanley did not know any of the details of the DEA investigation; instead, he knew DEA was requesting an interdiction stop of the Jeep only if he was able to develop probable cause based on a traffic violation.   Stanley also understood DEA wanted him to develop probable cause, if possible, for a search of the Jeep after any traffic stop.   From the beginning, Stanley planned to stop and search the Jeep if he could develop probable cause to

3

do so.

Based on information relayed to Stanley, he located the Jeep as it drove along I-75 in the dark near mile marker 283 in Bartow County. As he "paced" the Jeep on I-75, Fort drove at 82 miles per hour in a 70-miles-per-hour zone and crossed the white line. Stanley did not use his patrol car radar equipment because he had not tested/calibrated it that day. Stanley concluded the driver of the Jeep was speeding and failing to maintain his lane of traffic in violation of Georgia traffic laws. The Jeep then rapidly slowed to 65 miles per hour causing Stanley concern that the driver might be impaired. Stanley initiated a traffic stop by activating his patrol car blue lights. Once his lights were activated his patrol car recorded the stop with audio and video. While the patrol car recording equipment captures a few moments of video from before the blue lights are activated, audio is not. As a result, the traffic violations are not recorded given the sequence of events since the infractions occurred prior to a few moments before Stanley's blue lights were activated.

When the Jeep pulled over, Fort was the driver and Defendant was the front-seat passenger.[2] For officer safety reasons, Stanley approached the passenger side of the Jeep and spoke to Fort through the front-seat passenger window. While speaking with Fort, Stanley "immediately" smelled the faint odor of burned marijuana emanating from the Jeep. Stanley testified he planned to search the Jeep from that moment because the odor of marijuana emanating from the Jeep provided probable cause for the search.

Stanley told Fort why he was pulled over (speeding and failure to maintain lane) and asked for Fort's driver's license. Fort did not have a copy of his driver's license with him, but he had a

---

[2] Although Defendant and Fort had been sharing driving duties earlier that day, no evidence was presented that Stanley was aware of the shared driving duties or anything else about the occupants of the Jeep.

4

picture or document with his license driver's license number and he gave Stanley that number. Stanley then asked Fort to step out of the Jeep and met him behind the Jeep. Stanley told Fort he had been speeding and then rapidly slowed down, which Fort did not dispute. Instead, Fort indicated he slowed down because his mapping system indicated a crash ahead. When Stanley then asked about the marijuana odor he detected, Fort stated he had been around people smoking marijuana earlier that day. Fort neither denied the presence of the odor of marijuana nor did he admit that he had smoked marijuana.

Thompson arrived at the scene within a few minutes of the stop as Stanley talked to Fort behind the Jeep, Thompson approached the Jeep to speak with Defendant, who remained in the front passenger seat smoking a cigarette. Thompson testified that he immediately smelled the strong odor of unburned marijuana coming from the Jeep.

Stanley told Fort he was going to search the Jeep because of the marijuana odor. The Troopers then had Defendant get out of the Jeep. The Troopers quickly conducted a probable cause search of the Jeep based on their detection of the odor of marijuana and swiftly located suspected contraband: cash in Defendant's fanny pack, unburned marijuana in the center console, and a white powder in cellophane wrap in the cargo/hatch area of the Jeep that the Troopers thought was cocaine. Defendant and Fort sat on the guardrail while the Troopers searched the Jeep. The search of the Jeep took place within ten minutes of the traffic stop. During this time, Stanley is heard on the video telling Fort that he (Stanley) has not yet gotten any information back from dispatch based on the driver's license number Fort provided. In the hearing, Stanley confirmed this lack of information from dispatch about an out-of-state driver's license was not unusual given the license number was allegedly for a Tennessee license.

5

The Troopers neither advised Defendant or Fort of their Miranda[3] rights nor questioned them once the contraband was found. Instead, and as preplanned, Leon responded to the traffic stop scene shortly after the search to attempt to speak with Defendant and Fort. Leon approached Fort and Defendant who were still sitting on the guardrail with their hands in handcuffs behind their backs. Leon could smell unburned marijuana emanating from the Jeep upon approach.

Leon's Miranda rights advisement was captured on a video/audio recording taken on Leon's phone. Leon first asked if Fort and Defendant understood English. Defendant nodded in response to that question indicating to Leon that he (Defendant) understood English. After Leon then read the Miranda advisement of rights to both Defendant and Fort, Leon asked two questions back-to-back: "Do you understand the rights I read you? Understanding these rights do you want to speak to me?" Fort made no acknowledgment of the questions. Leon looked at Defendant and said, "What about you sir?" Defendant made no verbal response, but he nodded his head. Leon interpreted Defendant's non-verbal head nod as an affirmative answer to each question and told Defendant he would speak to him separately.

In a recorded custodial interrogation at the traffic stop scene, Leon took Defendant aside and talked to him. During this initial on-scene custodial interrogation, Leon concluded Defendant was not being very forthcoming and he stopped the interrogation and had Defendant placed in a patrol car. About five minutes later, an officer told Leon that Defendant asked to speak with him again. In the second recorded custodial interrogation at the traffic stop scene, Leon did not readvise Leon of his Miranda rights or ask for another waiver of those rights. Defendant then told Leon that Fort was his little "bro" and he did not want him to go to jail and that he (Defendant) wanted to claim the drugs. Defendant also made other incriminating statements and non-verbal

---

[3] As set forth in *Miranda v. Arizona*, 384 U.S. 436 (1966) (hereinafter "Miranda").

responses.

Later, after Defendant was transported to the jail, Leon was concerned for officer safety because he thought the white substance found in the Jeep was heroin potentially laced with fentanyl, not cocaine as the Trooper concluded. Therefore, at booking he asked Defendant if he needed to "worry about fentanyl," and Defendant allegedly said "nah—it's heroin." The substance was later lab tested and allegedly confirmed to be a heroin mixture containing fentanyl.

Additional testimony was elicited during the hearing, but it is not necessary to summarize the extensive testimony in greater detail herein. During the hearing, the following exhibits were also entered into evidence: GDPS video of stop (Government's Exhibit 1), video of the rights advisement/interview (Government's Exhibit 2), and GDPS Incident Report (Defendant's Exhibit 1). The Incident Report does not identify whether Stanley smelled burnt or unburned marijuana— just marijuana. All relevant evidence has been considered, even if not specifically summarized herein.

Defendant is charged in counts one and two of the six-count indictment against him and four alleged co-conspirators [Doc. 1]. Count one of the indictment alleges Defendant engaged in a conspiracy with each of his co-defendants to distribute 100 grams or more of a heroin mixture and 40 grams or more of a fentanyl mixture in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. Count two of the indictment alleges Defendant engaged in a conspiracy with each of his co-defendants to distribute 50 grams or more of methamphetamine (actual) in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846.

## II.    STANDARDS

### A.  Fourth Amendment

All seizures—including brief investigatory traffic stops—receive Fourth Amendment

protection.  *See United States v. Beauchamp*, 659 F.3d 560, 566 (6th Cir. 2011) (citing *United States v. Smith*, 594 F.3d 530, 535 (6th Cir. 2010)).   The Fourth Amendment guards against unreasonable searches and seizures.[4]   U.S. Const. amend. IV; *Elkins v. United States*, 364 U.S. 206, 222 (1960) ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures.").

As for the initial stop, officers may temporarily seize a person, i.e., conduct a *Terry* stop, if the officers have reasonable suspicion of criminal activity stemming from "specific and articulable" facts the officers know at the time of the stop.   *Terry v. Ohio*, 392 U.S. 1, 21-22, 27 (1968); *United States v. Bentley,* 29 F.3d 1073, 1075 (6th Cir. 1994) ("[W]here a law enforcement officer lacks probable cause, but possesses a reasonable and articulable suspicion that a person has been involved in criminal activity, he may detain the suspect briefly to investigate the suspicious circumstances.").   The more stringent probable cause standard requires "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion."   *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted).

An officer who decides to conduct a *Terry* stop must be acting on more than his "inchoate and unparticularized suspicion or 'hunch;'" rather, he must rely on "specific reasonable inferences which he is entitled to draw from the facts in light of his experience."   *Terry*, 392 U.S. at 27. "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence."   *United States v. Sokolow,* 490 U.S. 1, 7 (1989).   "[A] pattern of suspicious behavior need only be recognizable by one 'versed in the field of law enforcement.'"   *United States v.*

---

[4] A defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right.  *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001).   As a preliminary matter, the government does not contest that Defendant had a legitimate expectation of privacy with respect to all issues raised in his motion.

8

*Knox,* 839 F.2d 285, 290 (6th Cir. 1988) (quoting *United States v. Cortez,* 449 U.S. 411, 418 (1981)). Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *United States v. Ellis*, 497 F.3d 606, 613 (6th Cir. 2007) (citation and quotation marks omitted). This is not a high bar—all that is needed is "a minimal level of objective justification" for the stop. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Sokolow*, 490 U.S. at 7); *see also Navarette v. California*, 572 U.S. 393, 396-97 (2014).

Generally, if a seizure is not conducted in compliance with the Fourth Amendment, all evidence obtained as a result of the seizure must be suppressed. *See United States v. Gross*, 550 F.3d 578, 583 (6th Cir. 2008) ("[E]vidence and statements obtained from [an] illegality must be excluded as 'fruit of the poisonous tree.'" (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963))). This remedy of evidence exclusion is a "judicial innovation," *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2011), to be used as a "last resort, not [a] first impulse," *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

Defendant, as the proponent of the motion to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated by a challenged search or seizure. *See Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978) (citations omitted). It is the Government's burden, however, to demonstrate by a preponderance of the evidence that a particular search or seizure is constitutional. *See United States v. Baldwin*, 114 F. App'x 675, 681 (6th Cir. 2004) (citing *United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990)).

### B. Fifth Amendment

The Fifth Amendment protects a person from being compelled to incriminate himself. U.S. Const. amend. V. A suspect who is in police custody and subject to interrogation must be

given Miranda warnings against self-incrimination; if no Miranda warnings are given, then the incriminating statements elicited cannot be admitted at trial.   *Dickerson v. United States*, 530 U.S. 428 (2000).   The Fifth Amendment and the Due Process Clause of the Fourteenth Amendment also require that a statement or confession be voluntary to be admitted into evidence.   *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004); *Dickerson*, 530 U.S. at 433.

The government bears the burden to prove by a preponderance of the evidence that, prior to custodial interrogation, the defendant was given his Miranda rights, that he voluntarily and intelligently waived his Miranda rights, and that his confession or statements were made voluntarily.   *Seibert*, 542 U.S. at 608 n. 1; *United States v. Ray*, 803 F.3d 244, 269-70 (6th Cir. 2015).   A statement is voluntary if the defendant's will is not "overborne" by the circumstances surrounding the confession.   *Dickerson*, 530 U.S. at 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

If an individual in custody and subject to police interrogation is not given Miranda warnings, the issue of voluntariness is never reached.   If an individual in custody makes unwarned statements in response to interrogation, such statements must be suppressed. [5] *Dickerson,* 530 U.S. at 443-44 (holding Miranda warnings are constitutionally required before the government can admit into its case-in-chief statements made during custodial interrogation); *Tolliver v. Sheets*, 594 F.3d 900, 917 (6th Cir. 2010) ("In 2000, the [*Dickerson*] Court reaffirmed the rule that the prosecution may not use statements obtained through custodial interrogation in

---

[5] There are some exceptions to this rule; and one is the booking exception. Police may ask for information needed for booking purposes without giving Miranda warnings.   *See United States v. Pacheco–Lopez*, 531 F.3d 420, 423 (6th Cir. 2008).   Another exception is for public safety.   *New York v. Quarles,* 467 U.S. 649, 655-56 (1984) ("We hold that on these facts there is a 'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved.")

10

the absence of the specific rendering of the Miranda warning."); *United States v. Pacheco-Lopez*, 531 F.3d 420, 424 (6th Cir. 2008) ("Where the booking exception does not apply to statements made before administration and voluntary waiver of Miranda rights, those statements are irrebuttably presumed involuntary and must be suppressed.") (citation omitted).

## III.    ANALYSIS

Post-hearing, Defendant challenges the constitutionality of (1) the traffic stop; (2) the "duration and extended circumstances" of the traffic stop; (3) the warrantless vehicle search subsequent to the traffic stop; and (4) his statements, which he claims were made without a knowing, intelligent, and voluntary waiver of his right against self-incrimination [Doc. 97]. Contrary to Defendant's challenges, I **FIND** the stop, the scope and duration of the stop, the vehicle search, and the Miranda advisement and waiver were constitutional as addressed in the order they occurred below.

### A.  Traffic Stop

The United States Court of Appeals for the Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008); *see also Wren v. United States*, 517 U.S. 806, 810 (1996) (holding that stopping an automobile is reasonable where there is probable cause to believe a traffic violation has occurred); *United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (holding that reasonable suspicion standard is sufficient for ongoing traffic violation but not a completed misdemeanor).   "So long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment."   *United States v. Lott*, 954 F.3d 919, 922

(6th Cir. 2020) (quoting *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) quoting *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996)).

The uncontradicted testimony is that Stanley observed a speeding violation: that is, driving 82 miles per hour in a 70-mile-per-hour zone.   There was absolutely no testimony to the contrary. As argued by the Government, Stanley had probable cause to initiate a traffic stop for a violation of Ga. Code Ann. § 40-6-181(a)(3), which specifies the maximum lawful vehicle speed as seventy miles per hour on a highway on the federal interstate system.   *See also United States v. Mendez-Bernal*, Criminal Action No. 3:19-cr-00010-TCB-RGV, 2020 WL 6495109 at * 6 (N.D. Ga. July 22, 2020) (collecting cases), *report and recommendation adopted by*, 2020 WL 5494728 (N.D. Ga. Sept. 11, 2020).   Defendant seemingly acknowledges that *if* Stanley's testimony that he observed a speeding violation is found to be credible, then the stop itself is constitutional.

Defendant argues Stanley's testimony is incredible and should not be believed because (1) Stanley travelled 40 miles with the preplanned purpose of stopping and searching the Jeep; (2) the video does not corroborate Stanley's testimony that the Jeep was speeding or failed to maintain the lane of traffic; (3) there was no "radar ticket" to verify the speeding; (4) no traffic ticket or warning was ever issued to Fort; and (5) Stanley states his alleged basis for "the pre-textual stop on camera" after activating his blue lights to create probable cause for the stop [Doc. 97 at Page ID # 381].   Defendant's arguments are not persuasive.   Having carefully considered the evidence and testimony presented at the evidentiary hearing, I **FIND** Stanley's testimony, including that he observed the Jeep traveling in excess of the posted speed limit, is entirely credible.

First, the fact that law enforcement had other subjective reasons for making the stop is legally irrelevant.   *See, e.g., United States v. Canipe*, 569 F.3d 597, 601 (6th Cir. 2009) (holding that because the officer "possessed probable cause to believe that a traffic violation occurred when

12

he observed [defendant] not wearing a seatbelt, [officer's] motivation for making the stop (suspicion of unlawful possession of a firearm) did not undermine [the constitutionality of the stop]."); *see also United States v. Hughes*, 606 F.3d 311, 315-16 (6th Cir. 2010) (rejecting the district court's analysis as to why the officer "*really*" stopped the vehicle); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) ("[A]n officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle." (citing *Whren*, 517 U.S. at 812-13)); *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc) (holding that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful" (citations omitted)).

Second, it is well established that "police officers may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *Blair*, 524 F.3d at 748 (cleaned up). Officers will often have unrelated suspicions about a traffic violator, but reviewing courts do not ask whether an officer would have made a traffic stop if not for those unrelated suspicions; they ask only whether "this particular officer in fact had probable cause to believe that a traffic offense had occurred . . . ." *Ferguson*, 8 F.3d at 391. If so, the stop is reasonable. *Id.*

By his own account, Stanley was looking for any lawful reason to stop (and search) the Jeep. If Stanley is to be believed, Fort unwittingly provided the very probable cause Stanley was looking for by, at least, speeding. A decision to credit the testimony of one witness over another is "virtually never" error, so long as the witness's testimony is facially plausible, internally consistent, and uncontradicted by extrinsic evidence. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). In this case there is no contrary testimony at all. If the Court credits

13

Stanley's testimony that the Jeep was speeding, there plainly was probable cause for the stop.    I **FIND** Stanley's testimony was credible.

Stanley credibly explained why he paced the Jeep instead of using his radar equipment, why the video equipment did not record the speeding infraction, why he states/records the reasons for a stop once he activates his blue lights, and why he did not complete a warning ticket for the observed traffic infractions once the contraband was discovered.    Even after repeated and vigorous on cross-examination, Stanley's testimony remained plausible, internally consistent, and uncontradicted by extrinsic evidence.    When Stanley told Fort why he was stopped on the video, Fort did not deny that he was speeding and then rapidly slowed down.    And, as noted above, there was absolutely no testimony that Fort was not speeding.

Consequently, I **FIND** the Government has met its burden to establish probable cause for the stop based on the speeding violation.   Thus, it is unnecessary to address the Government's alternative argument that the collective knowledge of the officers constitutes at least reasonable suspicion to stop the Jeep even in the absence of a traffic violation.

As a result, the aspect of Defendant's motion to suppress based on the initial stop should be denied.

## B. The Scope and Duration of the Stop

Finding the initial seizure was justified does not end the inquiry as the Court must also address whether subsequent police conduct "was reasonably related in scope to the circumstances which justified" the initial interference.    *Terry*, 392 U.S. at 20.    As held by the Supreme Court:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation.    The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop.    Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave.    An officer's inquiries

14

into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

*Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citations omitted). As often reiterated by the Sixth Circuit:

> A valid *Terry* stop must be "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010). To be limited in scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500. To be limited in duration, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.*

*E.g., United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012).

No doubt, law enforcement officers may not unreasonably prolong an otherwise lawful stop without running afoul of the Fourth Amendment. *E.g., United States v. Stepp*, 680 F.3d 651, 661-62 (6th Cir. 2012) (citing *Everett*, 601 F.3d at 492 n.9) (holding that, to curb potential abuse because "a crafty officer . . . may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded, [courts] also treat the unreasonable extension of a not-yet-completed traffic stop as a seizure."). "[T]he proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*–including any prolongation due to suspicionless unrelated questioning–was reasonable." *Everett*, 601 F.3d at 494 (emphasis in original) (internal citations omitted). "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Id.* at 490 (quoting *Johnson*, 555 U.S. at 333).

The overarching inquiry is one of reasonableness. *Id.* at 493-94. To evaluate the

reasonableness of a stop, a court considers the diligence of the officer.   *Id.* at 494.   Again, the officer's "subjective intent or hope to uncover unrelated criminal conduct," is not relevant.   *Id.* at 495 n. 12 (citing *Whren*, 517 U.S. at 813).   The key inquiry is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.* at 494 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).   As held in *Rodriguez v. United States*, 575 U.S. 348, 354 (2015), "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." (Internal citation omitted).

Therefore, a traffic stop may not ordinarily last any longer than necessary to address the traffic infraction.   "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."   *Id*.   Tasks considered within the realm of an ordinary traffic stop include determining whether to issue a traffic ticket, checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance.   *Id*. at 355.   "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."   *Id*.

While the *Rodriguez* Court held "ordinary inquiries" related in scope to the purpose of a traffic stop are allowed, it also held such inquiries must be executed within the time it should have reasonably taken to complete them.   *Id.* at 1609 ("A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation.'"   *Id.* at 1612 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (alterations in original))).   The Supreme Court

16

endorsed precluding even a *de minimus* extension of a concluded stop, holding: "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission of issuing a ticket for the violation." *Id*. at 1612 (alterations in original) (internal quotation marks omitted).

The holding of *Rodriguez*—that a traffic stop may last no longer than necessary to achieve its purpose—is not a new proposition in the Sixth Circuit.   *See, e.g., United States v. Urrieta*, 520 F.3d 569, 574 (6th Cir. 2008) (holding that "[t]o detain a motorist any longer than is reasonably necessary to issue a traffic citation, an officer must have a reasonable suspicion that the individual has engaged in more extensive criminal conduct." (citation omitted)); *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002).    In *Everett*, the Sixth Circuit established a reasonable diligence standard to determine whether an officer has violated the Fourth Amendment by extending the duration of a traffic stop to ask questions, explaining:

> Because the reasonable diligence standard does not "require [an officer] to move at top speed," . . .   here, too, some amount of questioning is permissible—so long as the officer's overall course of action during a traffic stop, viewed objectively and in its totality, is reasonably directed toward the proper ends of the stop. By contrast, if the totality of the circumstances, viewed objectively, establishes that the officer, without reasonable suspicion, definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation, this would surely bespeak a lack of diligence. So, too, if the circumstances establish that, over the course of the entire stop, "questions unrelated to the traffic violation constituted the bulk of the interaction between the trooper and the [motorist]."

*Everett*, 601 F.3d at 495.

Even prior to *Rodriguez*, the Sixth Circuit had already "adopted a bright-line rule that any

subsequent prolonging, even *de minimis,* is an unreasonable extension of an otherwise lawful stop." *Stepp,* 680 F.3d at 661-62 (citing *Everett*, 601 F.3d at 492 n. 9) (citing *Urrieta*, 520 F.3d at 578-79)).   The Sixth Circuit has long held that "[o]nce the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot." *Hill,* 195 F.3d at 264.

Under the credible facts in this case, the purpose of the traffic stop for speeding clearly was not completed before the Troopers smelled marijuana.[6]   Generally, an odor that is "sufficiently distinctive to identify a forbidden substance" "might very well be to be evidence of the most persuasive character" for establishing probable cause.   *Johnson v. United States*, 333 U.S. 10, 13 (1948).   The Sixth Circuit has repeatedly held that "an officer's detection of the smell of marijuana in an automobile can by itself establish probable cause for a search."   *United States v. Grayer*, No. 20-5842, 2021 WL 3813198 at *3, (6th Cir. Aug. 26, 2021) (quoting *United States v. Elkins*, 300 F.3d 638, 659 (6th Cir. 2002)); *see also United States v. Avant*, 650 F. App'x 890, 892 (6th Cir. 2016) (smell of marijuana alone is sufficient to establish probable cause to search automobile); *United States v. Johnson*, 707 F.3d 655, 658 (6th Cir. 2013) (probable cause arose from the officer smelling marijuana in the vehicle); *United States v. McCaster*, 466 F. App'x 443, 446 (6th Cir. 2011) (marijuana odor coming from car gives rise to probable cause); *United States v. Garza*, 10 F.3d 1241, 1246 (6th Cir. 1993) (probable cause existed where an officer smelled marijuana coming from a vehicle).

Defendant argues, "It is not worthy that what sounded practiced, all officers smelled

---

[6]  For that matter, during the search they were still waiting for information about the status of Fort's license, which was entirely reasonable given that he was driving without his license on his person.

18

unburnt marijuana." [Doc. 97 at Page ID # 382].   It seems Defendant is asserting that the Troopers' testimony regarding the detection of the odor of marijuana from the Jeep is not credible. It also appears Defendant acknowledges that if the Court credits either Trooper's testimony that he smelled marijuana upon initially encountering the Jeep, the detection of the marijuana odor alone provides probable cause to extend the stop (and also to conduct a search of the Jeep under the automobile exception to the warrant requirement as discussed in detail below).   In short, without offering an ounce of contrary testimony or evidence, Defendant challenges the credibility of the Troopers' (and Leon's) testimony.   Again, however, Defendant's arguments are not convincing.

While Defendant questions whether Trooper Thompson could have detected the strong odor of unburnt marijuana over the cigarette smoke emanating from Defendant's burning cigarette, Defendant did not offer a whiff of evidence to support this challenge.   Nor did he successfully attack the Troopers' testimony about their abilities to, and experiences with detecting the odor of marijuana—albeit burnt or unburnt.   Although not specifically argued by Defendant in his post-hearing brief, Stanley's failure to record in his report whether the detected odor of marijuana was of burnt or unburnt marijuana is not inherently suspicious.   Moreover, the Troopers' testimony is certainly reconcilable with the evidence given (1) Fort acknowledged to Stanley that he had been around persons who smoked marijuana early that day—which plausibly explains the detection of a faint odor of burnt marijuana by Stanley—and (2) an open package of marijuana was found in the Jeep—which plausibly explains the detection of an odor of unburnt marijuana by Thompson (and later Leon).[7]

---

[7] Other pertinent evidence includes the hollowed-out tobacco inside of a cigar, given that a cigar shell is used to smoke marijuana according to the undisputed testimony.

19

Again, each Trooper's testimony was coherent, facially plausible, internally consistent, and not contradicted by extrinsic evidence. *See Anderson*, 470 U.S. at 575. In short, Defendant's argument concerning the scope and duration of the stop, which in his motion consists of a single sentence with no citation of authority and is not further illuminated in his post-trial brief, fails because the Troopers credibly testified they smelled a marijuana odor emanating from the Jeep. Nothing about either Troopers demeanor, tone, or actions during the recorded events or the suppression hearing undermine their credibility.[8] I **FIND** each Trooper credibly testified that he smelled marijuana emanating from the Jeep even after repeated and vigorous cross-examination. There simply is not an ounce of evidence supporting Defendant's claim that the lawful traffic stop for speeding was subsequently prolonged, even by a *de minimis* amount. *See Stepp,* 680 F.3d at 661-62; *Everett*, 601 F.3d at 492.

Accordingly, the aspect of Defendant's motion to suppress based on the scope and duration of the stop should be denied.

## C. The Vehicle Search

Defendant appears to argue that the automobile search is unlawful because the stop and search were pretextual. This argument was previously addressed and rejected in connection with the stop and need not be repeated here. The Government argues the vehicle search was based on law enforcement's probable cause to believe that Defendant's vehicle would contain evidence of a crime—marijuana possession. Again, the Government has the far better argument.

"Under the automobile exception to the warrant requirement, 'an officer may search a

---

[8] Leon's detection of the strong odor of unburnt marijuana does not support probable cause for the search because he arrived at the scene after the search had begun. However, I also **FIND** Leon testified entirely credibly and that his testimony supports my finding that the Troopers testified credibly.

readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime.'" *Johnson*, 707 F.3d at 658 (quoting *United States v. Redmond*, 475 F. App'x 603, 607 (6th Cir. 2012)); *see also Carroll v. United States,* 267 U.S. 132, 149 (1925) ("[I]f the search and seizure without a warrant are made upon probable cause, that is, upon a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction, the search and seizure are valid."); *United States v. Lumpkin*, 159 F.3d 983, 986 (6th Cir. 1998) ("Under the automobile exception to the warrant requirement, law enforcement officers may search a readily mobile vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime.").

In *United States v. Galaviz*, the Sixth Circuit elaborated on the mobility factor of the automobile exception to the warrant requirement:

> The automobile exception allows officers to search a vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime. This exception has traditionally been based on the ready mobility of the automobile, which created an exigency sufficient to excuse failure to obtain a search warrant. Recent cases have clarified that the automobile exception need not rest on an independent showing of exigency, because even in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception.

645 F.3d 347, 355 (6th Cir. 2011) (citations, quotation marks, and alterations omitted); *Carter v. Parris*, 910 F.3d 835, 839 (6th Cir. 2018) (holding that although the Fourth Amendment generally requires a warrant before performing a search, law enforcement may search a vehicle and a lockbox in the vehicle without a warrant if they have probable cause to believe that the vehicle contains evidence of a crime) (quoting *Galaviz*, 645 F.3d at 355)), *cert. denied*, 139 S. Ct. 2703 (2019).

"If there is probable cause to believe a vehicle contains evidence of criminal activity," officers may, without a warrant, search "any area of the vehicle in which the evidence might be found." *Arizona v. Gant*, 556 U.S. 332, 347 (2009) (citing *United States v. Ross*, 456 U.S. 798, 820-21 (1982)). The scope of a warrantless search based on probable cause is "no narrower–and no broader–than the scope of a search authorized by a warrant supported by probable cause." *Ross*, 456 U.S. at 823. "The scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted. Rather, it is defined by the object of the search and the places in which there is probable cause to believe that [it] may be found." *Id*. at 824. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id*. at 825. *Accord, e.g., California v. Acevedo*, 500 U.S. 565, 580 (1991) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained."); *United States v. Burnett*, 791 F.2d 64, 67 (6th Cir. 1986) ("Once the contraband was found, [the officer] had every right to search the passenger area of the car, the trunk, and any and all containers which might conceal contraband."); *Carter v. Paris*, 910 F.3d 835, 840 (6th Cir. 2018) ("The fact that the lockbox was a locked container inside the car also makes no difference."); *United States v. Collazo*, 818 F.3d 247, 259 (6th Cir. 2016) (finding probable cause for a vehicle search where driver acted "defeated" and stated there was something illegal in her purse); *United States v. Ross*, 300 F. Appx 386, 388 (6th Cir. 2008) (probable cause existed when passenger handed officer bags containing marijuana from inside the vehicle).

The marijuana odor—whether it was burnt, unburnt, or both—provided abundant probable cause for the vehicle search based upon the fair probability that contraband or evidence of a crime would be found in the Jeep. Applying the probable cause standard under the totality of the

circumstances, I **FIND** the Jeep was properly searched without a warrant or consent. Thus, it is unnecessary to address the Government's alternative argument that the collective knowledge of the officers would support the Jeep search even without considering the Troopers' olfactory observations.

Accordingly, this aspect of Defendant's motion to suppress based on the search of the Jeep should be denied.

### D. Miranda Advisement and Waiver

The final issue for resolution by the Court is whether Defendant understood and voluntarily waived his Miranda rights prior to making incriminating statements during his custodial interrogation. This is a much closer call than the other suppression arguments presented by Defendant. Clearly, the evidence does not establish a verbal or written Miranda waiver; instead, Leon interpreted Defendant's head nod and actions as a Miranda waiver. Defendant argues his head nod is not a sufficient waiver of his Miranda rights as it could be subject to more than one interpretation or was not in response to both questions that proceeded it.

Although Defendant's motion claimed he received no Miranda warning [Doc. 72 at Page ID # 165], he now appears to have abandoned this position in light of the recorded advisement. For the sake of clarity, however, I specifically **FIND** that Leon gave Defendant a proper Miranda warning prior to his custodial interrogation. This does not end the inquiry, however, because a defendant's "statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived [Miranda] rights' when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *United States v. Al-Cholan*, 610 F.3d 945, 954 (6th Cir. 2010) (quoting *Colorado v. Spring*, 479 U.S. 564, 572 (1987)) ("Statements made in

response to custodial police interrogation must be suppressed unless the suspect first waived his *Miranda* rights 'voluntarily, knowingly, and intelligently.'"). So, Defendant could relinquish his Miranda rights only (1) if his waiver was voluntary—i.e., "the product of a free and deliberate choice rather than intimidation, coercion, or deception," and (2) if it was knowing and intelligent—i.e., "made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Spring*, 479 U.S. 564, 573 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).

A valid Miranda waiver can be express or implied, based on the words and actions of the person interrogated. *Berghuis*, 560 U.S. at 383-84, 387. While a court must presume a defendant did not waive his Miranda rights absent an express waiver, "that does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights." *Butler,* 441 U.S. at 373. Thus, a waiver can be "inferred from the actions and words of the person interrogated." *Id*.

In short, the Supreme Court has held that law enforcement officers are not required to obtain a verbal or written waiver of Miranda rights before beginning custodial interrogation. *Berghuis*, 560 U.S. at 387-88. Instead, the waiver can be inferred from the suspect's words and actions. *Butler*, 441 U.S. at 373. A court must examine the "totality of the circumstances surrounding the interrogation" to determine whether the defendant made both an "uncoerced choice" and had the "requisite level of comprehension" such that a court may properly conclude that the defendant waived his Miranda rights." *Burbine,* 475 U.S. at 421.

Considering the totality of the circumstances, I **FIND** Defendant validly waived his Miranda rights. After nodding that he understood English in response to Leon's question and

then receiving Miranda warnings and being asked if he understood them and wanted to talk, Defendant again nodded. Defendant proceeded to speak freely and without any obvious hesitation or reluctance—not once, but twice—to Leon. Moreover, it is undisputed that Defendant initiated the second communication to claim the drugs in the Jeep to try to help Fort. While it certainly would have been more prudent for Leon to obtain a written or express verbal waiver, the law requires neither. *See id.*

Defendant's nods of his head and his actions and words after being read his Miranda rights signified that he understood and intended to waive those rights. This finding is bolstered by Defendant's request to again speak with Leon in an effort to help Fort avoid jail. I **FIND** Defendant's actions and words sufficient to constitute a valid Miranda waiver. *See id.*; *United States v. Mejia*, 600 F.3d 12, 17-18 (1st Cir. 2010) (valid waiver properly inferred because defendant, after being advised of Miranda rights, began responding to questions willingly and offered to be informant); *United States v. Williams*, 16-CR-6014W, 2016 WL 6311805, at *6 (W.D.N.Y. Oct. 26, 2016) (defendant's waiver inferred where defendant was advised of his Miranda rights, asked whether he understood them, responded "um-hum" and nodded his head, and answered investigators' questions), *report and recommendation adopted by*, 2016 WL 6952307 (W.D.N.Y. 2016).

In assessing whether Defendant's confession was made voluntarily, a court must determine, in the totality of the circumstances, whether the confession was the product of the defendant's unconstrained free will. *Schneckloth*, 412 U.S. at 225-26. Whether a defendant comprehended and voluntarily waived his *Miranda* rights must be determined from the "perspective of the police." *Al-Cholan*, 610 F.3d 954 (quoting *Garner v. Mitchell*, 557 F.3d 257, 263 (6th Cir. 2009)). Even "[e]vidence that a defendant suffered, at the relevant time, from a

condition or deficiency that impaired his cognitive or volitional capacity is never, by itself, sufficient to warrant the conclusion that his confession was involuntary for purposes of due process; some element of police coercion is always necessary." *United States v. Newman*, 889 F.2d 88, 94 (6th Cir. 1989). As the Supreme Court has explained, "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." *Colorado v. Connelly*, 479 U.S. 157, 164 (1986) (indicating that if the defendant's state of mind makes him susceptible to coercion, a lesser degree of coercive conduct may render the confession involuntary, but explaining that "mere examination of the [defendant]'s state of mind can never conclude the due process inquiry.").

While the Government bears the burden of proof to show that Defendant's waiver of *Miranda* rights and confession was voluntary, Defendant must first point to some evidence of improper police activity. *See United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir. 2000) (admitting confession where defendant "failed to advance any evidence of coercive police activity"). "Absent coercion," the Sixth Circuit has "held that a waiver was voluntary even where the defendant was under the influence of 'an intoxicating medication'" or had been "drinking heavily." *United States v. Dunn*, 269 F. App'x 567, 572 (6th Cir. 2008) (citations omitted). In this case, there is no credible reason to conclude that Defendant failed to understand the *Miranda* warnings he claimed in his motion were never given to him. No argument has been made indicating any evidence of police coercion.

The recording also refutes any contention by Defendant that his waiver and subsequent statements were coerced. Nothing in the record suggests that Defendant's age or characteristics rendered him particularly vulnerable to coercion or that he was intoxicated, sick or in pain. Defendant appeared calm, lucid and cooperative, appeared to understand the questioning, provided

coherent responses to those questions he chose to answer, and had a motive to speak with Leon. Moreover, Leon made no promises or threats to induce Defendant to waive his rights or speak.

Accordingly, the aspect of Defendant's motion to suppress regarding his Miranda warning and waiver should also be denied.

## IV.     CONCLUSION

For the reasons stated above, I **RECOMMEND**[9] that Defendant's motion to suppress [Doc. 72] be **DENIED** in its entirety.

ENTER:

s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[9] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party.   Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure.   Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985).   The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general.   *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986).   Only specific objections are reserved for appellate review.   *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).

27